*A.C. 3 Louis. 58/59 /*

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.

Directors of Banks are required to exercise ordinary care in the discharge of their duties.

But if any thing occurs to awaken suspicion of the fidelity of the subordinate officers of the institution, a high er degree of diligence must be exercised.

They are responsible in their private capacity for loss arising from any illegal measure of the board of directors which they did not oppose.

They are not responsible for errors of judgment unless the error be of the grossest kind.

They cannot delegate to the president & cashier the authority to dis-

*PERCY & AL.* vs. *MILLAUDON & AL.*

APPEAL from the court of the first district.

PORTER, J. delivered the opinion of the court. This is an action by the plaintiffs, stockholders in the late *Planters' Bank*, against the defendants, who are also stockholders in the same institution, to obtain a settlement of the accounts, a liquidation of the affairs, and a division of the funds belonging to the bank.

As necessary to this settlement, the plaintiffs allege, that three of the directors of the institution, viz: *Laurent Millaudon, Joseph Abat* and *Jean Lanna*, are indebted to it in a sum of $451,000 for fraudulent and unfaithful conduct by them, while acting in the capacity just stated. The specifications, given in the petition of their acts, are brought under the following heads:

1st. That, while acting as directors, they permitted the president and cashier of the bank, at divers times, between the 3d of August, 1817, and the 3d of November, 1819, to discount notes from the funds thereof, to a large amount, viz: $350,000 without the interven-

tion or assent of five directors, as required by the rules and regulations of the bank, by reason of which misconduct on their part, a loss was sustained by the institution to the amount of $112,000.

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

2d. That, after the 3d of November, 1819, and the 1st of May, 1820, they, being still directors, did aid and assist *Paul Lanusse*, the president, and *Bailly Blanchard*, the cashier, in discounting notes without the authority of the president and four directors; particularly notes of the president not endorsed, but payable to the president, directors and company of said bank, contrary to the rules and regulations thereof, and to its injury $100,000.

3d. That on divers days and times, between the 1st of June, 1819, and the day of July, 1820, the defendants, being directors of said bank, did collusively and fraudulently cause to be transferred to the bank 800 shares thereof *at par;* although by reason of the misconduct of the defendants, the stock had become of little value, and was then currently sold in New-Orleans at a great loss.

4th. That on the 16th of October, 1819, the defendants were appointed a committee to ex-

count bills or notes. If they sell stock above the market price to the president the contract is null and void. So it is if they borrow money of the bank from the cashier, on a promise to replace it, either in cash or bank stock They cannot discharge themselves from the responsibility they may have incurred as sureties of the cashier by reporting the transactions of that officer to be correct, and obtaining in this report a resolution of the board of directors, to discharge them.

Eastern Dist
*May*, 1829,

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

amine the state of the cash of the bank, after the disappearance of the cashier, and that they fraudulently reported the cash to be correct, whereas in truth it was not so; but there was a deficiency of $49,000 which was attempted to be covered by notes or due bills of *Paul Lanusse*, and for which sum two notes of *Paul Lanusse* were afterwards fraudulently discounted, through the connivance, and with the aid, of the defendants, which notes have not been paid.

5th. That the defendants wilfully, improperly and fraudulently voted to discharge the sureties of the cashier, viz: *Paul Lanusse* and *Jean Lanna*, one of the defendants, and cancel the bond they had given to the bank with said cashier, while at that time he was indebted to the institution in a large sum, viz: $49,000, and also in other sums of money.

6th. That they paid to the cashier and attorney of the bank $5,500 fraudulently and collusively with an intention of injuring the stockholders; and that at divers other times, they improperly paid to other persons large sums of money, which added, to those paid to the attorney and cashier, amount to the sum of 36,000

Eastern Dist
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

And 7th and lastly, That when the books of the bank were opened in 1818, and the unsubscribed stock was taken, the defendants failed to pay the amount which they subscribed or to collect that which had been subscribed for by others. That the sum so subscribed for was $126,000, no part of which was paid except the subscription of 100 shares, and that the balance, viz: $106,000 yet remain due and unpaid, for which the defendants are responsible.

Several of the stockholders, who refused to join in this petition, but who were necessarily made parties to the suit in order that a final settlement should be made between all, having an interest in the institution, have answered this petition, by declaring their ignorance of the matters therein alledged, and have required that to be done in the premises, which equity and justice may demand.

The defendants, *Abat, Millaudon* and *Lanna*, on whom fraudulent conduct is charged, and against whom such heavy responsibility is invoked, filed an answer in which they deny all the facts and allegations in the petition; more especially those which alledge fraud and

Eastern Dist. collusion on their part: and they further aver,
*May*, 1829. that, if in all the acts complained of, any be

Percy true, they were the acts of the whole board of
& AL.
*vs.*
Millaudon directors, done and made in good faith, and
& AL. free from bad and corrupt intention.

On these issues, the parties went to trial in
the court in the first instance. A great deal
of verbal and documentary evidence was in-
troduced. The judge was of opionion that,
though a gross misapplication of the funds was
established, and a consequent loss incurred by
the stockholders, there was no proof ad-
duced, which authorsed him to hold the defen-
dants responsible. That the loss was imputa-
ble to the improper conduct of the president
and cashier. He gave judgment against the
plaintiffs, and they appealed.

This case is one of great importance to both
plaintiffs and defendants from the large amount
in dispute; and of special interest to the latter,
as involving charges of the most serious nature
against their honesty and truth. It is also of
great importance to the public, who from the
number of these monied institutions and their
influence on the affairs of society, as well as on
those whose fortunes are embarked in them,

are deeply concerned in seeing that the agents
to whom their direction is intrusted should be
protected while they act faithfully; but visited
with the severest penalties of the law, if to the
injury of the institution, they pervert the trust
reposed in them, to their own emolument.

1. The first charge is the permission, given
to the president and cashier to discount paper
without the intervention and assent of four di-
rectors, as required by the 10th section of the
act of incorporation.

Before proceeding to state the evidence, by
which this charge is supported, and the effect
to which in our judgment it should be entitled,
it will be well to ascertain, and settle, the de-
gree of care and diligence which the law re-
quired in the defendants, while exercising the
trust of bank directors, and what responsibili-
ty such a situation imposed on them.

On this point, though there is some, we do
not conceive there is much difficulty. They
were the agents or mandatories of the stock-
holders, and as such undertook the manage-
ment of its affairs, according to the rules pre-
scribed by their charter, and by the bye, laws
made in pursuance thereof. By the provisions

Eastern Dist. of the civil code, in force at the time the trust
May, 1829. was undertaken, and at the period the breach

PERCY
& AL. of it was alledged to be committed, agents or
vs.
MILLAUDON attorneys in fact were made responsible not
& AL.
merely for infidelity in the management of the
affairs intrusted to them, but also for *their
fault. C. Code, p. 124, art. 17.* The only
correct mode of ascertaining whether there
was fault in an agent, is by enquiring whether
he neglected the exercise of that diligence and
care, which was necesary to a successful dis-
charge of the duty imposed on him. That dil-
igence and care must again depend on the na-
ture of the undertaking. There are many
things which, in their management, require the
utmost diligence, and most scrupulous atten-
tion, and where the agent who undertakes
their direction, renders himself resposible for
the slightest neglect. There are others, where
the duties imposed are presumed to call for
nothing more than ordinary care and atten-
tion, and where the exercise of that degree of
care suffices.

The directors of banks from the nature of
their undertaking, fall within the class last
mentioned, while in the discharge of their or-

Eastern Dist.
May 1829.

PERCY
& AL.
vs.
MILLAUDON
ʼIV ʼY

dinary duties. It is not contemplated by any of the charters, which have come under our observation, and it was not by that of the Planter's Bank, that they should devote their whole time and attention to the institution to which they are appointed, and guard it from injury by constant superintendance. Other officers on whom compensation is bestowed for the employment of their time in the affairs of the bank, have the immediate management. In relation to these officers, the duties of directors are those of controul, and the neglect which would render them responsible for not exercising that controul properly, must depend on circumstances, and in a great measure be tested by the facts of the case. If nothing has come to their knowledge, to awaken suspicion of the fidelity of the president and cashier, ordinary attention to the affairs of the institution is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible.

It is said by a writer of great authority who

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

treats of the doctrine of mandate, that the mandatory cannot excuse himself by alleging a want of ability to discharge the trust undertaken. That it will not be sufficient for him to say he acted to the best of his ability, because he should have formed a more just estimate of his own capacity before he engaged himself. That, if he had not agreed to become the agent, the principal could have found some other person willing and capable of transacting the business correctly. This doctrine, if sound' would make the attorney in fact responsible for every error in judgment, no matter what care and attention he exercised in forming his opinion. It would make him liable to the principal in all doubtful cases, where the wisdom or legality of one or more alternatives was presented for his consideration no matter how difficult the subject was. And if the embarrassment, in the choice of measures, grew out of a legal difficulty, it would require from him knowledge and leanring, which the law only presumes in those who have made the jurisprudence of their country the study of their lives, and which knowledge often fails in them from the instrinsic difficulty of the subject, and

the fallibility of human judgment. *Pothier*
*traite du mandat, No.* 48.

It is no doubt true, that if the business to be transacted, presupposes the exercises of a particular kind of knowledge, a person who would accept the office of mandatory, totally ignorant of the subject, could not excuse himself on the ground that he discharged his trust with fidelity and care. A lawyer, who would undertake to perform the duties of a physician; a physician, who would become an agent to carry on a suit in a court of justice— a bricklayer who would propose to repair a ship, or a landsman who would embark on board a vessel to navigate her, may be presented as examples to illustrate this distinction. Thus it was a provision of the Spanish law.— *Gran culpa es aquel que se trabaja de facer cosa que non sabe, o que le non conviene.—Par.* 7, *tit.* 34, *ley* 5. But when the person who is appointed attorney in fact, has the qualifications necessary for the discharge of the *ordinary duties* of the trust imposed, we are of opinion that on the occurrence of diff ties, in the exercise of it, which offer c choice of measures, the adoption of an-

rded

pinion

beration

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.

from which loss ensues cannot make the agent responsible, if the error was one into which a prudent man might have fallen. The contrary doctrine seems to us, to suppose the possession, and require the exercies, of perfect wisdom in fallible beings. No man would undertake to render a service to another on such severe conditions. The reason given for the rule, namely, that if the mandatory had not accepted the office, a person capable of discharging the duty correctly, would have been found, is quite unsatisfactory. The person who would have accepted, no matter who he might be, must have shared in common with him who did, the imperfection of our nature, and consequently must be presumed just as liable to have mistaken the correct course.— The test of responsibility therefore should be, not the certainty of wisdom in others, but the possession of ordinary knowledge; and by shewing that the error of the agent is of so gross a kind, that a man of common sense, and ordinary attention, would not have fallen into it. rule which fixes responsibility, because of unerring sagacity are supposed to exist, uld have been found by the principal, fro us essentially erroneous.

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

With this exposition of the duties imposed on the defendants, as directors of the bank, and the responsibility incurred by them, we proceed to the examination of the first charge contained in the petition.

The evidence on this head establishes the fact of a permission having been given, by the board of directors to the president and cashier to discount paper, which was at a longer date than 60 days, and it is also proved that two of the defendants *Abat* and *Lanna*, were present when this power was granted on the 13th August, 1817. But it is shewn that a few days after, in consequence of a protest very properly, and judiciously made by one of the directors, *De la Croix*, before a notary public of this city against the legality and correctness of the proceeding, the order granting the permission was repealed. This repeal took place on the 24th September of the same year, and was made on the motion of one of the defendants, *Millaudon*. Had it been proved that an injury was sustained by the bank in consequence of this impoper indulgence, accorded to its officers, we should have been of opinion that all the directors present at the deliberation

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.

of the board, who did not oppose the measure, would have been responsible to the stockholders in their individual capacities. It was an open and gross violation of the charter, which requires the president and four directors to constitute a *quorum* for discounts, and it cannot be excused on the want of knowledge of its impropriety, for it was a matter on which no dificulty could exist; the language of the statute being clear, and its meaning plain. But, during the time this order was in force, it is not shewn that any discounts were made by the president and cashier from which loss was sustained by the bank. It is true, we have proof that after this time, the cashier secretly advanced the president money on his notes, but there is not a *scintilla* of evidence that the defendants had any knowledge of his doing so, or that they connived at his misconduct in this particular. We therefore conclude this charge has not been sustained.

II. The second accusation is in substance the same as the first; and is equally unsupported by proof. It alleges fraud in the defendants, by their assisting the president and cashier to discount paper, between the 3d day of Novem-

ber, 1819, and the first day of May, 1820, with-
out the aid and intervention of four directors.
Now it is established, beyond all doubt, that
the cashier disappeared and (as it was after-
wards discovered) put a period to his existence
on the 16th of October, of that year, and that
*Lanusse* resigned his office of president on the
very day on which it is alleged the connivance
on the part of the defendants commenced, viz:
on the 3d day of November, 1819.

III. The third specification of misconduct
is the acts of the defendants, in transferring
to the bank a large number of shares, to the
amount of $160,000 at par, when it was well
known to them, and so the fact was, that the
stock, at the time the transaction took place,
was not of the value at which it was transfer-
red.

This is the part of the case which has crea-
ted the most difficulty in our minds, and the
effect, which the evidence is entitled to, cannot
be properly understood, without a full state-
ment of all the matters connected with the
transaction.

So far back as the year 1813, we find a reso-

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.
lution of the board of directors to purchase stock of the bank to the amount of $20,000 at twenty per cent. below par. On the 10th July, of that year, 23 shares were taken from a house which was unable to pay its notes. On the 13th September, another resolution was entered into to purchase stock at not more than ten per cent. below par, so that the stock might be reduced to $200,000. By the first of April, 1815, we see the determination had been so far carried into effect, as to make the stock held by individuals amount only to $225,600. That owned by the bank on the same day was $201,800.

In the commencement of the year 1818, an attempt was made, by persons not stockholders in the bank, to take the portion of stock which up to that time had not been subscribed for.— The board of directors refused them permission to do so, but afterwards opened the books and took the whole stock in their own names, for themselves and on behalf of those who were stockholders at the time. The capital being increased, we find on the 3d of April, a resolution of the board of directors was passed, two of the defendants, *Lanna* and *Millaudon*,

being present, which is in the following words:
"considering the scarcity of specie, it was
resolved that the president be authorised to
buy shares of the bank *not above par* and the
stock of the institution not to be less than
$200,000."

Between the date of this resolution, and the
first day of October, 1819, some shares were
purchased, among others, 45 from the defend-
ant, *Lanna*, at par, on the 29th June, 1819;
but on the 10th October, 1819, it appear from
the book of dividends that $300,000 was then
held by individuals, and that they were paid
their dividends on this amount.

Such being the amount of stock at that time,
we learn by a statement made by the cashier
eight days after, and eight days before he com-
mitted suicide, that $75,000 had been pur-
chased on account of the institution within the
preceding week; and that he held the defend-
ant, *Lanna's* notes for $25,000 to represent
stock to the same amount, which sum added to
$75,000 reduced the stock down to the amount
it was directed to be brought by resolution of
the 3d April, namely: to $200,000.

It would greatly have aided the court, in its

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

investigation of this matter, if the evidence af-
forded any clue, by which we could ascertain
whose stock was purchased between these two
periods of time, namely: the first and eighth of
October, and at what rate it was brought.  But
there is an hiatus in the transfer book from the
26th September, 1819, to the 15th October of
the same year, the time at which those trans-
actions took place.  The leaves appear to have
been cut out.  It would be improper in the
court to indulge in any suspicion as the cause
of this mutilation of the book, or by whom it
was made, for there is no evidence before us, it
was in its present situation, when it came out
of the possession of the defendants.  The
plaintiffs have offered to supply, by parol evi-
dence, in this tribunal, the contents of that por-
tion of the book which is wanting, by copies
taken from it when it was entire, but such evi-
dence, not having been given below, could not
be received here.

We cannot, however, disguise our impres-
sions of the extraordinary character of the
transaction.  The cashier, sometime before he
disappeared, must have been aware of the im-
pending ruin which awaited the bank and him-

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.

self. That at such a time and under such circumstances when the institution was pressed for money, and without specie to meet its engagements, he and the president, whose existance was at stake, or what is more dear to a feeling mind, whose reputation and good name depended on sustaining the credit of the bank, and preventing the disclosure of their misdeeds; that they at such a moment should pay out $100,000 for bank stock is almost beyond credence. If indeed the persons whose stock was thus taken at that time, were those to whom money had been privately advanced, an explanation is given, which tho' it shews highly culpable conduct on the part of the cashier and president, still enables us to account for their conduct on the ordinary principles of human action, but in any other view we have been able to take of the subject, their motives are inexplicable.

The presumption of this stock not having been transferred, in consequence of a sale duly and *bona fide* made to the president, in pursuance of the resolution of the 3d April, 1819, is much heightened by the statement of the cashier, that there was in the vaults of the

Eastern Dist
May, 1829,

PERCY
& AL.
vs.
MILLAUDON
& AL.

bank on the 8th October, notes of *Jean Lanna,* one of the defendants, for **$25,000,** which represented the same value in stock. These notes, we presume, were not given without value received, and the transaction only admits of two explanations; either the notes were given for money of the bank loaned by the cashier to the defendant, and the former thought proper to consider them as standing in the place of stock, or the money was obtained on a bargain for stock, by which the cash was immediately paid, and the stock was to be transferred at some future time. In either point of view, the agreement was equally reprehensible on the part of the defendant, **Lanna.** It was a breach of duty as flagrant as that of the president and cashier. There is no safety for monied institutions, if directors, who are appointed by the stockholders to attended to their affairs, and are placed as a check over the other officers of the bank, shall profit by the influence their station confers, to draw money out of its coffers, in any other way but by the legal and ordinary modes, and we doubt much whether the legality of the transaction can be cured by giving any thing else in payment, un-

less it is shewn to have been as beneficial to the institution, as the money improperly obtained would have been. The disposition, which must be made of the cause at present, does not render it necessary to express a definitive opinion on this point, but our present impressions are, that any contract, or agreement, by which the director of a bank obtains money belonging to it, from any of its officers, contrary to the rules of the institution, is null and void, and that no subsequent consummation of that contract supposing it to be executory, can cure the nullity.

From whom, and on what terms, the balance of the stock found in the vault, viz: $75,-000, was obtained, the evidence leaves us in the dark. The books shew no regular transfer of it. A serious question therefore presents itself, whether the defendants were justified in reporting as correct, transactions of the cashier, by which this stock stood in the place of cash. It is in evidence before us, that the defendants, previous to their proceeding to an examination of the vault, were informed of the culpable transactions, which had long existed between the cashier and the president;

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.
and were also instructed that the books there-
tofore kept, did not exhibit the true state of the
bank.    This information, joined to the fact
of the cashier having disappeared, was cer-
tainly sufficient to put them on their guard,
and it is difficult to believe they then consid-
ered the stock worth par; under these circum-
stances, if they found a quantity of certificates
of stock, on which the cashier had advanced
money without obtaining a regular transfer of
them, we do not think they acted judiciously
in receiving them as cash, unless there was
strong doubts of the solvency of those to
whom the money had been paid. But if the
stock was their own, and the title to it was not
in the bank, a much higher degree of responsi-
bility was incurred by their reporting the trans-
action to be correct.

We are inclined, however, to think that if
the certificates so found, were those of persons
other than the defendants, that they should
not be held responsible; on the ground, that
on finding the certificates there, they supposed
the whole transaction correct, and that they
presumed these evidences of stock had come
regularly into the hands of the cashier. In

Eastern Dist.
*May* 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

the confusion and alarm necessarily attendant on the disappearance of that officer, while the doors of the bank were besieged by the multitude, who demanded payment of its notes, it would not be surprising if their enquiry was not so complete, nor their judgment so correct, as it would have been under other circumstances. But if it should turn out on a further investigation that this stock was their own, that it had not been transferred, so as to make the contract binding on the bank, or sold above the market price; and that they reported it to stand correctly in place of cash, then we should be of opinion that no statement of theirs, pronouncing the transaction regular, could at all place them in another situation than they would have stood in, had no such report been made; and that, if no regular transfer existed of the stock at the time the cashier disappeared, the defendants still owe the money, they obtained on the deposit of it.

The counsel for the plaintiffs has proposed a mode of ascertaining to whom the stock belonged, which he considered infallible. We

VOL. VIII. (N. S.)        12

Eastern Dist.
May, 1829.

PERCY
& AL.
vs.
MILLAUDON
& AL.

have endeavored to avail ourselves of it; but we have been unable to come to a satisfactory conclusion, by the means indicated.  An examination of the names of the persons, who held the stock on the first day of October, 1819, compared with those who were owners of it, at a subsequent time, would, if a difference existed between them, certainly raise an almost irresistible presumption; that the stock found wanting at the last period, was that which had come into the hands of the cashier in the intermediate space of time.  But this fact does not establish whether the stock so wanting, came into the hands of the cashier, by a regular transfer; in consequence of a sale made to the president, or by private agreement with the cashier.  We therefore think the justice of the case requires it to be remanded.  The parties, being now apprised of the point which the court considers material, will be enabled to come prepared to elucidate it with all the proof in their possession, or within their reach.

As the case is one of great magnitude and embraces a variety of matter, we have thought the ends of justice would be promoted by ex-

pressing an opinion on the other heads of ac-
cusation alledged in the petition.    It will nar-
row the grounds of contest on the next trial;
and promote the discovery of truth by confin-
ing the attention of the parties in the court
below, to what is really material.

IV. The fourth ground, on which responsi-
bility is alleged is the report of the defendants
when appointed to examine the officers of the
bank, after the disappearance of the cashier;
their reporting the cash to be correct, when
there was a deficit of $49,000.

The report, made by the defendants, is found
on an entry made on the book of deliberations,
in the following words: "On *Mr. Lanna's*
motion, resolved, that all the transactions of
this bank, as well as the vault and promissory
notes, acceptances and bills receivable in the
port folio, having been found correct, according
to the statement of the book keeper, the late
*Bailly Blanchard* be discharged, and his
bond considered as void.

The propriety of this report, as preliminary
to a motion for the discharge of the cashier
and his secureties, will be considered hereafter.
In reference to this accusation, altho' it did not

Eastern Dist.
*May,* 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

state the facts correctly, it does not authorise us to hold the defendants responsible. It is proved that a great deal of zeal and activity, judiciously exercised, were displayed by the defendants to secure the debt which *Lanusse* owed for *overdrawing,* that security was obtained for it, and that it was paid. It is also shown that every exertion was made to secure the balance due by him on the notes discounted. Whatever therefore may have been the motives of the committee in making the report, as the bank was not placed in a worse situation than it otherwise would have been, in relation to *Lanusse,* we do not think the plaintiffs can fix responsibility on the defendants, on this ground.

V. The next accusation is the note given to discharge the cashier's bond, and of all the transactions which this litigation has developed, it appears to us the most unjustifiable. It exhibits gross and culpable negligence on the part of two of the defendants, *Abat* and *Millaudon,* and on the part of the other, *Lanna,* who was surety, an attempt to deceive the bank to his own advantage. The defendants formed the committee which had examined the vault.

Eastern Dist.
*May*, 1829.

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

They were apprised of the culpable conduct of the cashier. They had full evidence of it, furnished under his own hand, before the unfortunate man terminated his existence by a voluntary inflicted death. They knew the distress to which the institution was reduced, was owing to his, and the president's breach of duty. Yet with a perfect knowledge of all these facts, *Lanna*, the surety, moved the board to discharge the cashier, and consider the bond void, *every thing be found correct;* and the other defendants made no opposition to it. The most charitable construction of motives can find little or no apology for such conduct.

There is no doubt the defendant *Lanna* is still responsible on the bond, and whether judgement cannot be given against him, on the present state of the pleadings is a question we reserve until the case be finally decided, as we do the responsibility of the defendants, *Abat* and *Millaudon*, for permitting such a determination to be taken without opposition on their part.

VI. As to the charge of voting sums to the officers of the bank, in addition to their salary, we do not see any thing which may not

PERCY
& AL.
*vs.*
MILLAUDON
& AL.

be reconciled to a wish to reward zeal and merit, or what they considered such, in the service of the institution.

But one of the payments, that of $1000 to the attorney of the bank, stands on different grounds. The resolution granting it, is of date the 25th March, 1820, and the following is a translation of the order, which was signed by two of the defendants, *Abat* and *Millaudon*: "*Resolved*, That in case a suit is brought by the stockholders, against the president and directors of the bank, that *Mr. A. L. Duncan* will be employed to defend the latter, and that $1000 be allowed him for his services." When bank directors are in contest with the stockholders, and the fidelity and prudence of the agency of the former are at issue, we think each should pay their own counsel. There is just as much ground, for making the directors responsible for the attorney the stockholders would employ.

VII. The seventh accusation is completely disproved. It is shewn that all the stock subscribed for, has been paid.

It is therefore ordered, adjudged and decreed that the judgment of the district court be an-

nulled, avoided and reversed, that the case be remanded for a new trial, and that the appellees pay the costs of this appeal.

*Hennen* for the plaintiffs—*Mazureau* and *Grymes* for the defendants.